IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 24, 2026 Session

**IN RE GRACELYNN H.**

**Appeal from the Juvenile Court for Hawkins County**
No. HJ-24-0450 Amy Kathleen Skelton, Judge

_____

**No. E2025-00466-COA-R3-PT**
_____

In this case involving termination of the mother's parental rights to her minor child, the trial court determined that two statutory grounds for termination had been proven by clear and convincing evidence. The trial court further determined that clear and convincing evidence demonstrated that termination of the mother's parental rights was in the child's best interest. The mother has appealed.[1] Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which JOHN W. MCCLARTY, P.J., E.S., and KRISTI M. DAVIS, J., joined.

Cameron L. Hyder, Johnson City, Tennessee, for the appellant, Marquetta B.

Jonathan Skrmetti, Attorney General and Reporter, and Mara L. Cunningham, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I. Factual and Procedural Background

This case focuses on Gracelynn H. ("the Child"), the minor child of Marquetta B. ("Mother") and John C. ("Father"). When the Child was born in October 2023, she was diagnosed with Neonatal Abstinence Syndrome ("NAS") after a sample of her umbilical cord blood tested positive for amphetamines and methamphetamine. Upon a motion filed by the Department of Children's Services ("DCS"), the Hawkins County Juvenile Court

---

[1] The trial court terminated the father's parental rights to the child in the same proceeding. The father has not appealed the termination of his parental rights; therefore, we will confine our analysis to those facts relevant to the mother's appeal.

("trial court") entered an *ex parte* order on October 10, 2023, bringing the Child into the protective custody of the court and awarding temporary legal custody to DCS. The court found probable cause that the Child was dependent and neglected as to both parents, set a preliminary hearing date, and directed that the parents were to have no contact with the Child until further order of the court. The court appointed attorney Deborah Yeomans-Barton as the Child's guardian *ad litem* ("GAL"). DCS placed the Child with a foster mother ("Foster Mother"), with whom she was still residing at the time of trial.

Mother stipulated that the Child was dependent and neglected during a hearing conducted on November 27, 2023. Father did not appear. The trial court found the Child to be dependent and neglected by clear and convincing evidence and directed that the Child would stay in the protective custody of the court and legal custody of DCS. The court entered the order adjudicating the Child dependent and neglected on February 7, 2024. In the order, the court directed the parents to pay child support in accordance with Tennessee's child support guidelines but did not set support amounts.

On December 5, 2023, DCS developed a family permanency plan, which was presented as an exhibit at trial. In an order entered on June 5, 2024, the court ratified the permanency plan and found the plan to be in the Child's best interest and the responsibilities outlined therein to be reasonably related to achieving the stated goal of returning the Child to Mother's custody. Mother participated in the development of the permanency plan, under which she was required to meet the following requirements: (1) undergo an alcohol and drug assessment and follow all recommendations, (2) submit to random drug screens, (3) undergo a mental health assessment and follow all recommendations, (4) undergo a parenting assessment and follow all recommendations, (5) obtain and maintain a home that would be safe and appropriate for the Child, (6) resolve all pending legal charges, (7) refrain from accruing additional legal charges, (8) obtain and provide proof of legal employment, and (9) request and participate in at least two visits per month with the Child.

It is undisputed that Mother participated in supervised visitation with the Child on four occasions before she was arrested for possession of methamphetamine and drug paraphernalia on January 26, 2024. On February 7, 2024, Mother was arrested again and charged with falsifying a drug test, resisting arrest, assaulting an officer, and possessing methamphetamine and drug paraphernalia. After the latter arrest, Mother remained incarcerated until July 2024. Mother then entered the True Purpose Ministries ("True Purpose") treatment program, where she remained at the time of trial. After her entry into the True Purpose program, Mother resumed supervised visits with the Child.

On June 10, 2024, approximately one month before Mother's release into True Purpose, the GAL filed a petition to terminate Mother's and Father's parental rights. As to Mother, the GAL alleged statutory grounds of (1) abandonment through failure to visit the Child, (2) abandonment through failure to financially support the Child, (3) abandonment

- 2 -

through exhibition of wanton disregard for the Child by an incarcerated parent, (4) failure to substantially comply with the permanency plan, (5) severe child abuse, and (6) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child. The GAL also alleged several statutory grounds for termination against Father and further alleged that it was in the Child's best interest to terminate Mother's and Father's parental rights.

DCS revised the permanency plan on July 16, 2024, with alternative permanency goals of either returning the Child to Mother's custody or preparing for adoption. In the plan, DCS noted that Mother had been accepted to True Purpose as an intensive outpatient program and that she had "actively sought out this program herself." Under the plan, Mother's responsibilities were updated as follows: (1) participate openly and honestly in True Purpose and comply with any service recommendations made by the program, (2) undergo a mental health assessment once released from incarceration, (3) address previous charges for illegal substances during an upcoming hearing, (4) continue seeking employment by submitting at least four applications per week, (5) follow through on acceptance for subsidized housing after incarceration was complete, (6) establish and maintain a bonded relationship with the Child, and (7) follow a parenting assessment recommendation to complete a parenting education curriculum.[2]

On October 7, 2024, DCS filed a motion supporting the GAL's termination petition and requesting that DCS be allowed to join in the GAL's petition pursuant to Tennessee Rule of Civil Procedure 19.01.[3] DCS also sought to supplement the pleadings. At trial, the GAL and DCS (collectively, "Petitioners") announced an agreement to strike from their claims the statutory ground of abandonment through failure to support the Child.

The trial court conducted a bench trial on February 11, 2025. Mother was present for trial, and Petitioners called her as an adverse witness.[4] Petitioners also presented testimony from DCS Case Manager Amber Nerren and Foster Mother. Mother presented testimony from April Greene, who was the house director, intake coordinator, and pastoral counselor at True Purpose.

Mother testified that her parental rights should be maintained because she had complied with the permanency plan and believed that she could be "the mother that [the Child] need[ed] [her] to be." Mother acknowledged that her use of illicit substances during pregnancy had caused the Child to be born addicted to drugs. Mother also acknowledged

---

[2] Ruling from the bench, the trial court orally ratified the revised permanency plan at the close of the termination trial. The court entered a written order ratifying the revised permanency plan on May 20, 2025.

[3] Because the GAL remained a petitioner throughout the trial court proceedings, the GAL is considered an appellee. However, the GAL did not file an appellate brief or expressly join in the brief filed by DCS.

[4] Father did not appear for trial.

that she had struggled with substance abuse previously, had relapsed after attending a rehabilitation program, and had not yet resolved her legal issues. However, Mother urged that she had made significant progress at True Purpose and firmly believed that she had overcome her substance abuse issues. Mother testified that while at True Purpose, she had maintained employment with a McDonald's restaurant, earning approximately $400 weekly; paid $100 weekly in rent; paid off her child support arrearage, and paid current child support regularly. Mother reported that she could remain at True Purpose for an extended period and that she had access to daycare services there and would soon obtain her driver's license. Mother recognized that she would be returned to prison if she failed to successfully complete the True Purpose program, but she reiterated that she felt confident about her success in the program. Mother also testified that she was worried about Foster Mother's having left the Child in someone else's care.

Ms. Nerren testified that the Child's umbilical cord blood had tested positive for amphetamines and methamphetamine. Ms. Nerren also explained that DCS had placed the Child with Foster Mother rather than the Child's maternal grandmother because Mother had been residing with the maternal grandmother when she was using drugs. According to Ms. Nerren, at the time of the petition's filing in June 2024, Mother had failed to comply with several requirements of the permanency plan because Mother had not proven financial responsibility, resolved her legal issues, completed a mental health assessment, or completed a parenting assessment. Ms. Nerren acknowledged that following Mother's incarceration, Mother had completed random drug screens and had not missed a scheduled visit with the Child. Ms. Nerren also related that it would be possible for the Child to reside with Mother at True Purpose, but she expressed concern that if Mother relapsed, Mother would be incarcerated again. Ms. Nerren further testified that Foster Mother had provided the Child with excellent care, including medical care, and that she had only left the Child in the care of DCS-approved individuals.

Foster Mother testified that she was employed as a neonatal nurse practitioner and that from the time the Child was five days old, the Child had resided with her. Foster Mother indicated that she lived in her own home with her two college-aged biological children and a second foster infant. Foster Mother explained that when she was at work, her parents, who lived next door, or family friends watched the Child and that this generally occurred three nights per week. Foster Mother detailed that when the Child entered her home, the Child had exhibited eating and sleeping difficulties typical of NAS but that the Child had since recovered. Foster Mother additionally noted her close bond with the Child and emphasized that the Child became distressed when separated from her. Foster Mother stated that she desired to adopt the Child.

Ms. Greene testified that Mother had made excellent progress at True Purpose. According to Ms. Greene, Mother was an exemplary student who met her own goals and was committed to mentoring other women in the program. Ms. Greene confirmed that anyone who failed to complete the True Purpose program would return to incarceration.

On March 11, 2025, the trial court entered a final judgment terminating Mother's and Father's parental rights. Concerning Mother, the trial court concluded that Petitioners had proven two of the termination grounds alleged: (1) abandonment through wanton disregard of a child by an incarcerated parent and (2) severe child abuse. The court expressly found that Petitioners had failed to prove the other grounds alleged against Mother by clear and convincing evidence.[5] Upon consideration of the factors enumerated in Tennessee Code Annotated § 36-1-113(i)(1), the court determined by clear and convincing evidence that termination of Mother's and Father's parental rights was in the Child's best interest. Mother timely appealed.

## II. Issues Presented

Mother presents one issue on appeal, which we have restated as follows:

1. Whether the trial court erred by finding clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest.

DCS raises an additional issue, which we have similarly restated:

2. Whether the trial court correctly determined that statutory grounds to terminate Mother's parental rights had been proven by clear and convincing evidence.[6]

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-34 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations

---

[5] The trial court concluded that Petitioners had proven all termination grounds alleged against Father.

[6] DCS has not challenged the trial court's findings regarding the statutory grounds that the court determined were not proven against Mother by clear and convincing evidence. Accordingly, we will confine our review of statutory grounds to the two grounds upon which the trial court terminated Mother's parental rights. *See, e.g.*, *In re Liberty T.*, No. E2022-00307-COA-R3-PT, 2023 WL 2681897, at *3 n.3 (Tenn. Ct. App. Mar. 29, 2023).

regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interest and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 754. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than simply as more probable than not. *In re Audrey S.*, 182 S.W.3d 652, 660 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

* * *

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether

- 6 -

the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

## IV. Statutory Grounds for Termination of Parental Rights

Tennessee Code Annotated § 36-1-113 (West July 1, 2023, to June 30, 2024) lists the statutory requirements for termination of parental rights, providing in relevant part:[7]

> (a)    The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4 . . . .
>
> * * *
>
> (c)    Termination of parental or guardianship rights must be based upon:
>
>> (1)    A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
>>
>> (2)    That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined that the evidence clearly and convincingly supported findings of two statutory grounds to terminate Mother's parental rights: (1) abandonment through wanton disregard for the Child by an incarcerated parent and (2) severe child abuse. We will address each of these statutory grounds in turn.

---

[7] Unless otherwise noted, throughout this Opinion all citations to any section within Tennessee Code Annotated §§ 36-1-113 and 36-1-102 shall be made in reference to the version that was effective on the date the termination petition was filed in the trial court and not to any other version of the statute. *See, e.g.*, *In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at *4, n.6 (Tenn. Ct. App. Aug. 5, 2023). In some instances, as here, the subsection that was in effect at that time has not changed.

A. Abandonment through Wanton Disregard by an Incarcerated Parent

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> > (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred[.]

Regarding the definition of abandonment applicable to the statutory ground at issue here, Tennessee Code Annotated § 36-1-102(1)(A) (West July 1, 2023, to June 30, 2024) defines abandonment in pertinent part as:

> (iv) A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action if the child is four (4) years of age or more or three (3) consecutive months immediately preceding the filing of the action if the child is less than four (4) years of age and has:
>
> > * * *
>
> > (c) With knowledge of the existence of the born or unborn child, engaged in conduct prior to, during, or after incarceration that exhibits a wanton disregard for the welfare of the child[.]

Regarding this termination ground, this Court has previously explained:

> Tenn. Code Ann. § 36-1-102(1)(A)(iv) also reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child. Incarceration severely compromises a parent's ability to perform his or her parental duties. A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the

- 8 -

child. *Taxonomy of Children's Rights*, 11 Wm. & Mary Bill Rts. J. at 958. However, parental incarceration is not an infallible predictor of parental unfitness. Accordingly, Tenn. Code Ann. § 36-1-102(1)(A)(iv)'s second test for abandonment does not make incarceration alone a ground for the termination of parental rights. An incarcerated or recently incarcerated parent can be found guilty of abandonment only if the court finds, by clear and convincing evidence, that the parent's . . . conduct displayed a wanton disregard for the welfare of the child. Thus, the parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child.

*In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005) (footnote omitted). Furthermore, this Court has concluded that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867-68.

In this case, when the GAL filed the petition on June 10, 2024, Mother had been incarcerated since February 7, 2024, or for nearly four months. Given that the Child was under four years of age, this ground applied because Mother had been incarcerated for at least three consecutive months at the time of the petition's filing and had knowledge of the Child. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv)(c). Concerning Mother's actions, the trial court specifically found that Mother had "used illegal substances while she knew she was pregnant and thereby exposed the unborn child to amphetamines and methamphetamines." The court further found that prior to her incarceration, Mother had "failed drug screen(s), was not paying child support, was not cooperating with DCS to complete her action steps, and [had] engaged in criminal activity that resulted in her incarceration." The court noted that Mother had incurred the following criminal charges:

a. January 26, 2024:    Possession unlawful drug paraphernalia uses and activities

b. January 26, 2024:    Methamphetamine — possess[ion] or casual exchange

c. February 7, 2024:    Assault — physical contact

d. February 7, 2024:    Resist stop, arrest, search (no weapon)

Accordingly, the court found that Mother had "knowingly engaged in conduct that exhibit[ed] a wanton disregard for the welfare of the minor child." Upon careful review, we agree.

On appeal, Mother has not raised an issue regarding the statutory grounds, but within her best interest argument, she asserts that the trial court erred in its finding of wanton disregard by failing to adequately consider Mother's progress after incarceration. Mother acknowledges that she was incarcerated for over three months prior to the termination petition's filing, that the Child was born drug-exposed, and that Mother regressed in her substance abuse and incurred criminal charges after the Child's birth. However, Mother emphasizes that she failed only one drug screen required for a visit with the Child prior to her January 2024 arrest and that she accomplished several requirements of her permanency plan after incarceration while in the True Purpose program.

We recognize the progress Mother made in the True Purpose program, including her consistency in visiting the Child and in making child support payments after her incarceration. However, Mother admitted that she had engaged in substance abuse while pregnant with the Child and with knowledge that her drug use could harm her unborn baby. Moreover, the Child's umbilical cord drug screen clearly demonstrated that the Child was born with amphetamines and methamphetamine in her system, and Ms. Nerren's and Foster Mother's respective testimonies indicated that the Child suffered from NAS after her birth. This Court has previously affirmed the termination of a parent's rights on the statutory ground of wanton disregard based upon a mother's prenatal drug use. *See In re C.T.S.*, 156 S.W.3d 18, 25 (Tenn. Ct. App. 2004) ("It is clear that [the mother] ingested crack cocaine during her pregnancy and immediately before the birth of [the child], knowing the effects it would have on her child. . . . Such conduct clearly exhibits a wanton disregard for the welfare of the child."); *In re Maisynn Y.*, No. E2025-00486-COA-R3-PT, 2025 WL 3676234, at *6 (Tenn. Ct. App. Dec. 17, 2025) ("Perhaps most indicative of a wanton disregard for [the child's] welfare was Mother's decision to use drugs while pregnant with knowledge that such drug use could result in [the child's] experiencing significant health issues.").

Under prior versions of the statute, only the parent's conduct prior to incarceration was at issue when determining wanton disregard. *See In re Audrey S.*, 182 S.W.3d at 866. Under the amended version applicable here, courts may consider the parent's conduct "prior to, during, or after incarceration." *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv)(c). Mother argues that the trial court erred by failing to adequately consider the improvement in her post-incarceration conduct. However, the statute provides for consideration of whether the parent's conduct has constituted wanton disregard for the child at any one of three points in time: "prior to, during, or after incarceration." *Id.* (emphasis added); *see In re Taiden B.*, No. M2024-00101-COA-R3-PT, 2025 WL 227663, at *4 (Tenn. Ct. App. Jan. 17, 2025) ("[[T]the trial court was not required to name a specific time period for the conduct that exhibited a wanton disregard."). The court did not err in determining, by clear

and convincing evidence, that Mother had engaged in conduct exhibiting a wanton disregard for the Child's welfare prior to her incarceration.

## B. Severe Child Abuse

The trial court found clear and convincing evidence that Mother had committed severe child abuse. Regarding this ground for termination of parental rights, the applicable version of Tennessee Code Annotated § 36-1-113(g)(4) provided:

> The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

As relevant to this action, the applicable version of Tennessee Code Annotated § 37-1-102(b)(27)(E) (West May 5, 2023, to June 30, 2024) defined "severe child abuse" as:

> Knowingly or with gross negligence allowing a child under eight (8) years of age to ingest an illegal substance or a controlled substance that results in the child testing positive on a drug screen, except as legally prescribed to the child[.]

As our Supreme Court has held:

> [I]n the context of severe child abuse, a person's conduct is considered "knowing," and a person is deemed to "knowingly" act or fail to act, when "he or she has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her." *In re S.J.*, 387 S.W.3d [576,] 592 [(Tenn. Ct. App. 2012) (citing *In re R.C.P.*, [No. M2003-01143-COA-R3-PT,] 2004 WL 1567122, at *7 [(Tenn. Ct. App. July 13, 2004)]). Under this standard, the relevant facts, circumstances, or information would alert a reasonable parent to take affirmative action to protect the child. For deliberate ignorance, persons can be found to have acted knowingly "when they have specific reason to know" the relevant facts, circumstances, or information "but deliberately ignore them." *In re R.C.P.*, 2004 WL 1567122, at *7. For reckless disregard, if the parent has been presented with the relevant facts, circumstances, or information and recklessly disregards them, the parent's failure to protect can be considered "knowing."

*In re Markus E.*, 671 S.W.3d 437, 464-65 (Tenn. 2023).

Mother has not challenged the trial court's determination that she committed severe child abuse. In concluding that Petitioners had proven this ground by clear and convincing evidence, the trial court found that "[u]pon birth, the minor child's cord stat drug screen was positive for amphetamines and methamphetamines." The court further found that Ms. Nerren had "testified that the minor child was diagnosed with neonatal abstinence syndrome (NAS) after birth due to [Mother's] use of illegal substances while pregnant" and that Foster Mother had reported "the struggles that the minor child faced due to the NAS diagnosis—such as, feeding and sleep issues, tremors, sneezing, and stomach issues." In finding that Mother's actions were knowing, the trial court referenced Mother's testimony "that she used methamphetamines while pregnant," "that she was aware of the dangers to her unborn child," and "that her doctor explained the dangers of using illegal substances during a prenatal visit." The court also referenced Mother's testimony "that she used methamphetamines two (2) days before the minor child was born." The court described Mother's testimony "that it was not in the best interests of the minor child for the minor child to have been exposed to the illegal substances" and Mother's acknowledgement that the Child had "suffered at birth due to the exposure in utero to illegal substances." Upon thorough review of the record, we conclude that the evidence preponderates in favor of the trial court's findings.

Mother committed severe abuse of the Child by using illicit substances while pregnant with knowledge that doing so posed a danger to the Child and with the result that the Child was born with amphetamines and methamphetamine in her system. *See In re Emmalyn H.*, No. E2022-00710-COA-R3-PT, 2023 WL 3411598, at *5 (Tenn. Ct. App. May 12, 2023) ("We have previously held that a mother's drug use while pregnant may constitute severe child abuse to the unborn child . . . .") (citing *In re Joshua C.*, No. E2016-00081-COA-R3-PT, 2016 WL 4069288, at *3 (Tenn. Ct. App. July 28, 2016)). The trial court properly found clear and convincing evidence of this statutory ground for termination of Mother's parental rights to the Child.

## V. Best Interest of the Child

When, as here, a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i)(1) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case.").

Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i)(1) lists the following factors for consideration:

(A)     The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C)     Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D)     Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E)     Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)     Whether the child is fearful of living in the parent's home;

(G)     Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)     Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)     Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)     Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial

- 13 -

for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)     Whether the physical environment of the parent's home is healthy and safe for the child;

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

The statute further provides: "When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2).

As our Supreme Court has instructed regarding the best interest analysis:

These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome

- 15 -

determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

Apart from analysis of the best interest factors, Mother advances the position that the GAL filed the termination petition prematurely. Mother asserts that when the GAL filed the petition after the Child had been in DCS custody for eight months, it was in contravention of the "Criteria and Procedures for Termination of Parental Rights" ("Criteria and Procedures") that DCS had provided to the parents. Mother does not specify what part of the Criteria and Procedures she contends were violated by the petition's filing. It appears that Mother may be alluding to section III of the Criteria and Procedures, which refers to the federal Adoption and Safe Families Act of 1997 ("ASFA") and to Tennessee Code Annotated § 36-1-113. *See generally In re Kaliyah S.*, 455 S.W.3d 533, 544 (Tenn. 2015) (explaining Tennessee's amendments of statutes to comply with the ASFA). Under § 36-1-113(h)(1)(A), DCS is required to file a termination petition or join in a termination petition filed by another party "[i]n the case of a child who has been in foster care under the responsibility of the department for fifteen (15) of the most recent twenty-two (22) months." Contrary to Mother's argument, this requirement does not prevent DCS from filing a termination petition or, as here, joining in a petition filed by the GAL when a child has been in foster care for less than fifteen months. Mother's argument regarding the timing of the petition is unavailing.

In its final judgment, the trial court made detailed findings regarding the best interest factors and concluded that ten factors weighed in favor of terminating Mother's parental rights, five weighed against, and five were neutral or inapplicable. Upon careful review of the evidence presented, we determine that clear and convincing evidence established that termination of Mother's parental rights was in the Child's best interest.

Mother primarily argues that (1) the trial court failed to give sufficient weight to Mother's progress in adjusting her circumstances since her incarceration and (2) DCS failed to make reasonable efforts to facilitate reunification.[8] We will address Mother's first two arguments within our review of best interest factors that include consideration of Mother's progress and DCS's efforts to assist Mother. However, to the extent that Mother urges this Court to consider events that have occurred since the termination trial, we emphasize that we may not do so. Mother has not filed a motion to consider post-judgment facts, and with exceptions not applicable here, only "those facts established by the evidence

---

[8] Mother also asserts that the GAL failed to make reasonable efforts to assist Mother in reuniting with the Child. Mother does not offer any legal support for her argument that the GAL was required to assist her, and we find the argument unavailing given the GAL's established role in representing the best interest of the Child in dependency and neglect and termination proceedings. *See* Tenn. Sup. Ct. R. 40.

- 16 -

in the trial court and set forth in the record" may be considered by this Court on appeal. *See* Tenn. R. App P. 13(c).

Within the best interest analysis, factors (A) and (C) are related by reason of their emphasis on the Child's stability and safety. The trial court determined that factor (A) (the Child's critical need for stability and continuity of placement) weighed in favor of termination. The court found that although Mother had "housing at her recovery program," "her housing and history of substance abuse do not ensure stability and continuity of placement throughout the child's minority." The court concluded that termination of Mother's parental rights would "allow for the minor child to be adopted by the foster mother and have continuing stability and placement."

Similarly, the trial court found that factor (C) (whether the parent has demonstrated continuity and stability in meeting the child's needs) weighed in favor of termination. The court determined that Mother had "never had the minor child reside with her to where she provide[d] for the daily needs of the minor child." Again recognizing that Mother had "maintained housing while at her recovery program," the court nonetheless found that Mother had "not proven that she can obtain and maintain independent housing that would be a safe place to provide for all of the needs of the minor child." The court concluded that Mother had "not provided continuity in providing the child's basic material, educational, housing, safety needs." We conclude that the evidence supports the trial court's findings regarding factors (A) and (C).

By contrast, the trial court determined that factor (J) (whether the parent has demonstrated a lasting adjustment) weighed against termination of Mother's parental rights. The court stated:

> The Court finds that [Mother] has shown commitment to her recovery program and that she has made significant changes in her life. [Mother] has employment, has temporary housing at her recovery program, continues to participate in the recovery program, and has paid child support and used visitation with the minor child. The Court has concerns regarding [Mother's] maintaining her current situation due to her long history of substance abuse but hopes that [Mother] does continue to succeed.

The evidence supports the trial court's findings as to Mother's adjustment since she entered the True Purpose program, and we agree that this factor weighs against termination. However, we also find valid the court's concerns regarding Mother's history of substance abuse.

In weighing factor (B) (the effect a change of caretakers and physical environment would have on the child) in favor of termination, the trial court found:

- 17 -

[A] change of caretakers and physical environment would be detrimental to the minor child. The minor child has stability, safety, and permanency in her current foster home, and . . . it is the only home that she has ever lived in. The Court further finds that the foster mother has provided significant care for the minor child since she was discharged from the hospital after birth, and that the minor child is extremely bonded to the foster mother. [Mother] acknowledged that the minor child was bonded to the foster mother. The foster mother has provided for all of the minor child's medical needs. The child is thriving with the foster mother per the testimony of the case worker and foster mother. The minor child would struggle to be separated from the foster mother per the testimony of the case worker and foster mother.

We conclude that the evidence preponderates in favor of the trial court's findings as to factor (B).

Factors (D), (E), (H), and (I) are related due to their emphasis on parental attachments and relationships. The trial court determined that factors (D) and (E) weighed against termination but that factors (H) and (I) weighed in favor of termination. With respect to factor (D) (whether the parent and child have a secure and healthy attachment), the court concluded that Mother had a relationship with the Child and "desire[d] to have a strong relationship" with the Child. As to factor (E) and Mother's visitation with the Child, the court concluded that Mother had "utilized her visitation to try to create a positive relationship" with the Child. The evidence preponderates in favor of the trial court's findings as to factors (D) and (E), and we agree with the court's decision to weigh these two factors against termination.

However, the trial court found that factors (H) (whether the child has created a healthy parental attachment with another person) and (I) (whether the child has emotionally significant relationships with other persons) weighed in favor of termination. The court found that the Child had "created a significantly healthy parental attachment to the foster mother," having been "placed with the foster mother upon being discharged from the hospital after birth." The court again referenced testimony concerning the strong bond between Foster Mother and the Child proffered by Ms. Nerren, Foster Mother, and Mother herself. The court further found that the Child maintained "significant relationships with the foster siblings" and that testimony had demonstrated "the important role that the foster mother's friends and family play with the minor child—and that losing those persons would be detrimental for the minor child." The court observed that the Child had "no relationship with any persons from the families" of either Mother or Father. The evidence also preponderates in favor of the trial court's findings as to factors (H) and (I), and we agree with the trial court's decision to weigh these two factors in favor of termination.

The trial court found that Factor (F) (whether the child is fearful of living in the parent's home) and factor (G) (whether the parent, parent's home, or others in the parent's

- 18 -

home exacerbate a child's experience of trauma) did not weigh for or against termination due to the Child's young age and the fact that she had been placed in protective custody a few days after her birth. The Child had never lived in or visited Mother's home, and no evidence was presented regarding whether the Child was fearful of living in Mother's home or whether Mother was a trigger of any traumatic experience. Accordingly, we determine that the trial court did not err in finding that factors (F) and (G) weighed neither for nor against termination. *See, e.g.*, *In re Skyler M.*, No. M2024-00960-COA-R3-PT, 2025 WL 2400238, at *19 (Tenn. Ct. App. Aug. 19, 2025) (affirming the trial court's finding that factors (F) and (G) were inapplicable when the child had been removed from the mother's care as a three-month-old infant); *In re Lola-Rayne D.*, No. M2024-00980-COA-R3-PT, 2025 WL 2161114, at *6 (Tenn. Ct. App. July 30, 2025) (affirming the trial court's findings that factors (F) and (G) were inapplicable when the child had been removed from the mother's custody at birth and had experienced only supervised visitation after the mother's incarceration); *but see In re Alizah S.*, No. E2025-00110-COA-R3-PT, 2025 WL 3235695, at *7 (Tenn. Ct. App. Nov. 19, 2025) (affirming the trial court's findings that factor (F) weighed against termination and factor (G) was inapplicable when "[t]he child was removed from Mother's custody immediately after the child was born, and Mother never moved beyond supervised visits with the child.").[9]

Factors (K) and (L) both concern services and assistance offered to parents. The trial court determined that factor (K) (whether the parent has taken advantage of available programs and services) weighed against terminating Mother's parental rights. The court found that Mother had "participated fully in the recovery program at True Purpose," as evinced by Ms. Green's testimony that Mother had "participated in anything offered by their program and [had] been successful." Concerning Factor (L) (whether DCS had made reasonable efforts to assist the parent), the court determined that the factor did not weigh in favor of either party, concluding:

> DCS made reasonable efforts to assist [Mother] as it pertains to [Mother's] situation. [Mother] did not utilize the services offered to her by DCS other than visitation prior to her incarcerations. DCS provided visitation and worked with [Mother] throughout the entirety of this matter. True Purpose Ministries provided [Mother] with many of the recovery services that were needed, but [Mother] ended up in that program due to her criminal charges and not due to DCS facilitating that program.

On appeal, Mother argues that DCS so failed to provide reasonable efforts to assist Mother that it is "astonishing" and "should shock the conscience of the Appellate Court."

---

[9] "Depending on the circumstances, this Court has classified a ground for which there was a lack of evidence as, variously, weighing against termination, being neutral, or being inapplicable." *In re Skyler M.*, 2025 WL 2400238, at *19 (citing *In re Colten B.*, No. E2024-00653-COA-R3-PT, 2025 WL 252663, at *9-10 (Tenn. Ct. App. Jan. 21, 2025), for its thorough discussion of the various approaches).

In support, Mother relies on the timing of the petition's filing before Mother's release from incarceration and what she terms DCS's "avoidance" of Mother. In response, DCS maintains that it provided reasonable efforts to Mother throughout the case by creating permanency plans through child and family team meetings, following up with rehabilitation and mental health providers, providing drug screening, facilitating visitation, setting up an alcohol and drug assessment, and initially conducting home visits and offering homemaker services in an effort to place the Child with the maternal grandmother. The record supports DCS's accounting of its efforts to assist Mother. However, DCS has not challenged the court's finding that factor (L) was essentially neutral, weighing neither for nor against termination. Considering also the court's determination that Mother's eventual effective utilization of services was through True Purpose, a program not facilitated by DCS, we conclude that the evidence preponderates in favor of the court's findings that factor (K) weighed against termination and factor (L) was neutral.

Factors (M), (P), (Q), and (R) all relate to Mother's actions to meet the Child's needs. The trial court determined that factors (M), (Q), and (R) weighed in favor of termination, and we agree. With respect to factor (M) (whether the parent has demonstrated a sense of urgency in addressing the conditions that made an award of custody to her unsafe), the trial court found that Mother "did not make any steps to rectify her situation for approximately eight (8) months after the minor child was placed into DCS custody" and that she "did not begin making significant changes until she entered the recovery program." The court concluded that although Mother had been "successful at the program since the fall of 2024," she had not demonstrated "a sense of urgency after she lost custody" of the Child in October 2023. The above facts also apply to factor (Q) (whether Mother demonstrated the ability and commitment to creating a home that would meet the Child's needs) and factor (R) (the physical environment of Mother's home).

The trial court found that although Mother's performance in True Purpose showed that she was "attempting to move towards this goal," Mother did not "have her own home to demonstrate her ability and commitment to create and maintain a home that meets the basic and specific needs for this minor child to thrive." Recognizing that Mother's current residence at True Purpose allowed for parents to have their children with them, the court found that such an arrangement "should be healthy and safe for a child." However, the court also found that because "[t]his program is not a long term or permanent placement" and Mother did not "have her own home to show that she can independently provide," the Child's need for "stability and permanency" must prevail. The evidence preponderates in favor of the trial court's findings that factors (M), (Q), and (R) weighed in favor of termination.

The trial court determined that factor (P) (whether Mother demonstrated an understanding of the basic and specific needs required for the Child to thrive) weighed against termination because Mother had "used her visitation and worked on improving her parenting education." Although DCS does not challenge the trial court's finding that factor

- 20 -

(P) weighed against termination, DCS does assert that Mother had "never met the child's needs" because Mother had used drugs while pregnant and was arrested only a few months after the Child was born. DCS acknowledges that at the time of trial, Mother was "taking advantage of the treatment program and learning the child's needs." Foster Mother's and Ms. Nerren's respective testimonies demonstrated that the Child had experienced some difficulties as a result of NAS and that Foster Mother had secured services from Tennessee Early Intervention System ("TEIS") for the Child in her home as well as taking the Child to physical therapy. It was not clear from Mother's testimony whether she understood the special needs of the Child. However, as DCS admits, Mother was "learning" the Child's needs, and for this reason, we find no error in the trial court's finding that factor (P) weighed against termination.

The trial court did weigh factor (O) (whether the parent has ever provided safe and stable care for a child) in favor of terminating Mother's parental rights. The court found that Mother had "never provided safe and stable care" for the Child and that "there was no testimony that [Mother] [had] ever provided safe and stable care for any other child." The court further found that Mother "had the opportunity to provide safe and stable care for the minor child during her pregnancy but instead used illegal substances that caused harm to the minor child." We agree with the trial court's assessment of this statutory factor.

With respect to factor (S) regarding child support, the trial court determined that this factor weighed neither for nor against termination. The court found that Mother had not paid child support "for approximately one year after the minor child was placed in DCS custody" but had subsequently made payments according to the child support guidelines and "paid what arrearages Child Support Enforcement calculated." The court concluded: "Because of the delay in starting child support while combined with child support being currently paid, the Court finds that this factor does not weigh in favor of Petitioner[s] or [Mother]." The evidence preponderates in favor of these findings.

In also determining that factor (T) (the parent's mental or emotional fitness) weighed neither for nor against termination, the trial court found that Mother had "made great efforts to improve her mental and emotional fitness and [was] still participating in recovery programs to address this." However, the court concluded that Mother's progress was balanced by concerns, based on Mother's "long substance abuse history," regarding whether Mother's mental and emotional fitness would "allow her to consistently provide safe and stable care and supervision of the child." We conclude that the trial court's findings concerning Mother's mental and emotional fitness to parent the Child were supported by the evidence.

Moreover, the trial court determined that factor (N) weighed in favor of terminating Mother's parental rights to the Child "due to her neglect towards this minor child by . . . using illegal substances while pregnant." In a prior section of this Opinion, we have affirmed the trial court's ruling that Mother's use of illicit drugs while pregnant with the

Child constituted severe abuse of the Child. The evidence preponderates in favor of the court's findings as to factor (N) as well.

Mother insists that "[t]he trial court gave too little weight to [Mother's] reformed behavior and too much weight to the initial incident," meaning Mother's substance abuse while pregnant with the Child that caused the Child to be removed from her care. We disagree. As DCS points out, Mother's actions that harmed the Child were not confined to one incident when the Child tested positive for amphetamines and methamphetamine at birth. Mother admitted that she had not been able to curtail her drug use during pregnancy and that she had taken methamphetamine two days before the birth. Subsequently, Mother failed a drug screen in November 2023 and missed a total of three visits with the Child until she passed two consecutive drug screens and could resume visitation. Then in January and February of 2024, Mother was arrested on drug charges that kept her incarcerated and separated from the Child until she began supervised visitation again with her release into the True Purpose program in July 2024. Mother's progress in True Purpose was commendable, and the trial court noted that progress again and again in its consideration of the best interest factors. However, the court also validly expressed concerns that Mother's situation at the time of trial was not a stable one for the Child and that, as Mother acknowledged, she would return to incarceration if she relapsed in her drug use.

Mother relies on the decision in *In re Scarlett F.*, No. W2021-01292-COA-R3-PT, 2022 WL 4286927, at *15 (Tenn. Ct. App. Sept. 16, 2022), wherein this Court reversed the trial court's finding that termination of the mother's parental rights was in the child's best interest upon determining that the mother had "accomplished something rarely seen in parental termination cases—she established that "'[n]ot all parental conduct is irredeemable'" (quoting *In re Audrey S.*, 182 S.W.3d at 877). We find *Scarlett F.* to be factually distinguishable from the instant case. In *Scarlett F.*, the mother had, *inter alia*, "worked with DCS and completed all the tasks the permanency plans required of her" and remained drug free for more than two years after she had completed drug-addiction treatment. 2022 WL 4286927, at *15. Here, Ms. Nerren testified that at the time of the petition's filing, Mother had yet to comply with several requirements of the permanency plan. In its final order, the trial court determined that since her entry into True Purpose, Mother had "made notable progress on completing most of the action steps in the permanency plan" but had yet to secure permanent housing and fully resolve outstanding legal charges. Mother had flourished in a drug-addiction treatment program for seven months, but she was still in the program at the time of trial and had not demonstrated that she was ready to provide a stable home for the Child outside of that controlled environment.

As this Court has stated when confronted with a similar situation:

Although Mother has made significant progress during her rehabilitation, as previously discussed, due to Mother's relapses, her sobriety has not been tested outside the controlled environment of her rehabilitation program such

that we can say that it would be in the child's best interest to be returned to her custody.

*In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at *11 (Tenn. Ct. App. Aug. 15, 2023). Mother argues that she simply needs more time, but the "child's best interests must be viewed from the child's, rather than the parent's, perspective." *See White*, 171 S.W.3d at 194. We emphasize that "[w]hen considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2). We therefore affirm the trial court's determination by clear and convincing evidence that termination of Mother's parental rights to the Child was in the Child's best interest.

## VI. Ineffective Assistance of Trial Counsel

In the final sentence of her appellate brief, Mother asks this Court to "remand[] this matter for a new trial due to the absolute ineffectiveness of trial counsel." DCS responds that Mother has waived any issue regarding the effectiveness of trial counsel by failing to raise it in her statement of the issues and by failing to develop an argument with citations to the record and to authority. *See* Tenn. R. App. P. 27(a)(4), (7); Tenn. Ct. App. R. 6(a)-(b). We agree with DCS and determine this issue to be waived. Moreover, having thoroughly reviewed the record and trial transcript, we find no indication that Mother's trial representation caused her to be denied a fundamentally fair parental termination proceeding. *See In re Krystopher C.*, No. M2024-00097-COA-R3-PT, 2025 WL 2017077, at *15 (Tenn. Ct. App. July 18, 2025) ("[T]his Court may review the Parents' claim of ineffective assistance of counsel within our consideration of whether the Parents were denied 'a fundamentally fair parental termination proceeding.'" (quoting *In re Carrington H.*, 483 S.W.3d at 536)).

## VII. Conclusion

For the foregoing reasons, we affirm the trial court's judgment. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Mother's parental rights to the Child and collection of costs assessed below. Costs on appeal are assessed to the appellant, Marquetta B.

s/ Thomas R. Frierson, II
THOMAS R. FRIERSON, II, JUDGE